1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

THOMAS E. PEREZ, SECRETARY OF
LABOR, UNITED STATES DEPARTMENT
OF LABOR,

               Plaintiff,

      v.

UNITED STATES POSTAL SERVICE,

           Defendant.

No. 12-00315 RSM

FINDINGS OF FACT AND CONCLUSIONS
OF LAW AND MEMORANDUM ORDER

## I.  INTRODUCTION

This case is before the Court on Plaintiff's claims against Defendant United States Postal Service (the "Postal Service") under the Occupational Safety and Health Act, 29 U.S.C. §§ 651 *et seq.* (the "Act"). Plaintiff, the Secretary of Labor (the "Secretary") alleges that the Postal Service violated Section 11(c)(1) of the Act, 29 U.S.C. 660(c)(1), by retaliating against its employee, Arthur Williams ("Williams"), because of his protected activities under the Act. A five-day bench trial, beginning on September 15, 2014, was held to adjudicate the Secretary's claims. At the conclusion of the trial, the Court took the matter under advisement and ordered supplemental briefing on the appropriate scope of injunctive relief. The Court has now considered the evidence presented at trial, the exhibits admitted into evidence, the parties' trial and supplemental briefs, the parties' proposed Findings of Fact and

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

Conclusions of Law, and the arguments of counsel at trial. The Court, being fully advised, enters judgment in favor of the Secretary and makes the following Findings of Fact and Conclusions of Law.

## II.  BACKGROUND AND PROCEDURAL HISTORY

This case concerns the Postal Service's actions taken against Williams following his engagement in activities indisputably protected under the Act, including transfer, de facto demotion, antagonistic investigative interviews, a letter of warning, enforced leave, public humiliation, and refusal to consider Williams for a promotion. The Secretary's Amended Complaint asserted that the Postal Service retaliated against Williams and subjected him to a hostile work environment because of his protected activity in violation of Section 11(c)(1) of the Act, 29 U.S.C. § 660(c)(1) ("Section 11(c)"). Dkt. # 31 ("FAC").

The Court denied the Postal Service's motion for summary judgment and reserved ruling on the Secretary's hostile work environment claim. Dkt. # 67. The Court requested, and the parties provided, supplemental briefing on whether a hostile work environment theory of liability was cognizable under Section 11(c). Dkt. ## 68-70.  The Court also granted in part the Secretary's motion for sanctions for spoliation of evidence. Dkt. ## 66, 71. Pursuant to its Order, the Court drew a rebuttable presumption at trial against the Postal Service's performance-related justification for adverse employment actions taken with respect to Williams, following his protected activities. Dkt. # 71.

The Court held a bench trial on September 15-17, 2014 and September 22-23, 2014 and heard closing arguments on October 22, 2014. The following constitute the Court's Findings of Facts and Conclusions of Law, pursuant to Federal Rule of Civil Procedure 52(a). To the extent certain findings of fact may be deemed conclusions of law, or certain conclusions of law be deemed findings of fact, they shall each be considered conclusions or findings, respectively.

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

### III. FINDINGS OF FACT

**A. Williams' Initial Employment with the Postal Service**

1. The Postal Service is an employer subject to the requirements of the Act. Dkt. # 72, p. 3.

2. The Postal Service first employed Arthur B. Williams in 1995 and has continuously employed Williams to the present. *Id.*

3. Williams initially worked as a mail carrier and then as a mechanic in bargaining unit positions. Trial Tr. Vol. 2 at 52-53.

4. In March 2002, Williams was promoted to a non-bargaining unit, management position on the Executive and Administrative ("EAS") pay scale: an EAS 15 Human Resources Specialist in the Safety Department of Defendant's Seattle District. Trial Tr. Vol. 2 at 54:22-55:17; Vol. 3 at 60:7-20. In September 2003, Williams was further promoted to an EAS 16 Safety Specialist in the Safety Department of the Seattle District. Dkt. # 72, p. 3.

5. As both an EAS 15 Human Resource Specialist and an EAS 16 Safety Specialist, Williams was a safety generalist, with responsibility for tasks associated with Defendant's facilities as assigned by the Manager of Safety. *Id.* These tasks included providing safety advice and processing safety forms at over 300 small postal facilities or area offices throughout Washington. Trial Tr. Vol. 2 at 55:7-17.

6. In October 2006, Williams was promoted to an EAS 17 Safety Specialist, as a result of which his regular office was moved from the Seattle District Office, then located in Seattle's Queen Anne neighborhood (the "District Office"), to the Seattle Processing and Distribution Center (hereinafter, the "P&DC" or the "Plant") in south Seattle. Dkt. # 72, p. 3. As an EAS 17, Williams was responsible for Safety Department activities at four large Postal Service facilities: Seattle P&DC, Everett Processing and Distribution Facility, South Delivery and Distribution Center, and East Delivery and Distribution Center, all facilities with over 1,000 employees. *Id.*

7. As an EAS 16 Safety Specialist, Williams worked for then-Safety Manager Jay Kaseman. In his Fiscal Year 2005 and 2006 annual evaluations, Kaseman ranked Williams as an exceptional

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

contributor on two core requirements, a high contributor on one, and a contributor as to oral communication. Exs. 2, 3.

8.   The EAS 17 position required Williams to plan, coordinate and evaluate safety and health activities and trainings, to conduct periodic inspections and evaluations for hazardous conditions and unsafe work practices, to investigate accidents and fatalities, to ensure management enforcement of compliance with safety and health policies and regulations, and to attend labor-management safety and health committee meetings. *Id.*; Trial Tr. Vol. 2. 61:14-24.

9.   Williams frequently made reference to the Occupational Safety and Health Administration ("OSHA") standards in his EAS 17 role and was involved in working with non-management and management employees to resolve OSHA complaints. *Id.* at 64:20-22; 140:14-23. He became known by the nickname "Little OSHA" at the Seattle P&DC. Trial Tr. Vol. 2 at 65:19-66:4.

10. Kelly Johnson became Manager of Safety in summer of 2007, at which point she began to oversee Williams' performance. Trial. Tr. Vol 1 at 100:6-23. Her Fiscal Year 2007 annual performance review for Williams ranked him as an exceptional contributor in one respect, high contributor in another, and contributor in two respects. Ex. 4.

**B.  Williams' February 20, 2008 Protected Activity**

11. On February 20, 2008, Williams engaged in protected activity within the meaning of the Act by assisting causal employee Naseem Banani in filing a complaint with OSHA. Dkt. # 72, p. 3.

12. Banani, a causal (i.e. temporary, non-union) employee at the P&DC, approached Sue Fesler, a union steward, and James White, a craft employee and union safety advocate, about breathing difficulties she was experiencing while working on the flat sorter machine. Trial Tr. Vol. 1 at 46:3-14. Banani told Fesler that she had explained the situation to her supervisors but had not received any assistance. *Id.* at 47:5-11.

13. Fesler and White took Banani to Williams' office at the P&DC. *Id.* at 48:24 - 49:25. Banani repeated her account to Williams, reporting that her supervisors had threatened to terminate her and

that she had received no training as to her rights. *Id.*; Vol. 2. 71:24-73:2. Williams informed Banani that, though she had no union rights, she could contact the Equal Employment Opportunity Commission ("EEOC") or OSHA. *Id.*; Vol. 1 at 49:6-13. He provided Banani with the phone number to OSHA. *Id.*

14. On February 20, 2008, Williams sent an email to Banani's supervisor, Manager of Distribution Operations ("MDO") Pamela Cook, and Cook's supervisor, James Guffey, informing them of his meeting with Banani. His email stated that Banani felt she would be fired and that "OSHA will be reviewing the results to determine if we have a health issue." Ex. 15.

15. On February 25, 2008, Banani filed a complaint with OSHA. Dkt. # 72, p. 3; *see also* Ex. 16. Banani testified that following her complaint, Cook berated her, interrogating her as to why she went to Williams and complained to the EEOC and OSHA. Trial Tr. Vol. 1 at 33:7-15. Banani testified that Cook instructed her to "take the [OSHA and EEOC] complaint[s] back" if she "ever want[ed] to work again for the Postal Service []." *Id.* at 33:1923. Banani further testified that Cook stated, "You know, Naseem, no one can touch us. No one here has ever done anything. They try to, but no one can touch us, so go do what you want to do." *Id.* at 33:24-35:2.

16. As MDO, Cook reported to Senior MDO James Guffey, who reported to Senior Plant Manager Don Jacobus. Trial Tr. Vol. 3, 5:21-6:1. Cook has since been promoted to Senior Plant Manager in Las Vegas, Nevada, where she currently serves. *Id.* at 4:3-17.

**C.  Responses to Williams' Protected Activity**

17. On February 26, 2008, OSHA sent notification to the Postal Service of Banani's health complaint. Ex. 16.

18. According to Jacobus, OSHA complaints were handled according to a predetermined process, which involved investigation by the Safety Specialist. Trial Tr. Vol. 5, 24:20-26:3. On this occasion, Jacobus informed MDO Carlo Salazar by email on February 27, 2008 that he did not want Williams to "have anything to do with [Banani's complaint]." Ex. 19; *see also* Trial Tr. Vol. 5, 34:3-18.

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

19. On February 26, 2008, Jacobus sent Williams an email, informing him that his "continuing and obvious interest in representing the bargaining unit will not be tolerated. Until further notice you will refrain from ANY professional dialog with the bargaining unit with exception of your domiciled safety advocates and any team meetings or projects." Ex. 17 (capitalization in original). Williams experienced the email as stressful, hurtful, and degrading. Trial Tr. Vol. 2 at 75:1-18.

20. Jacobus had not personally observed any examples of poor job performance by Williams. Trial Tr. Vol. 5 at 10:23-11:2. He had also never previously documented or expressed in writing concerns about Williams' job performance. *Id.* at 35:6-16.

21. As Senior Plant Manager, Jacobus occupied the highest position at the P&DC, reporting directly to the Area Vice President for the Western Region. *Id.* at 22:4-9. If the P&DC received a high number of OSHA citations, the matter could arise in Jacobus' performance evaluation. *Id.* at 23:2-9.

22. On or about February 26, 2008, Williams was assigned to work at the Seattle District Office in Queen Anne. Dkt. # 72, p. 4. While domiciled at the District Office, Williams did not suffer a reduction in salary or compensation. *Id.*

23. Jacobus viewed Williams' transfer as terminating his role as a Safety Specialist at the P&DC. Trial Tr. Vol. 5, 30:23-31:1.

24. Williams' abrupt transfer, without notice or explanation, was a subject of discussion and confusion among craft employees at the P&DC. Prior to his departure, craft employees saw him on the P&DC floor daily. Trial Tr. Vol. 1, 51:24-52:10.

25. The conditions of Williams' employment changed sharply upon his transfer. Williams was first assigned to work at an administrative desk in an open area, rather than in a cubicle or office, and was not provided a telephone. Trial Tr. Vol. 2, 104:25-105:18. He was initially permitted only to read emails. *Id.* at 76:11-15. Williams was the sole employee stationed in the open area. Trial Tr. Vol. 3 at 85:21-86:13.

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

26. Williams was subsequently assigned to work in a windowless file storage room in the Labor Relations area. It was wintertime and cold in the storage room. Labor Relations Manager Charles Kosmicki had never seen any other employee working in the storage room. *Id.* at 86:14-87:12.

27. Kosmicki was not consulted prior to Williams' transfer to the District Office in contravention of protocol. *Id.* at 81:7-82:10.

28. On March 3, 2008, OSHA notified the Postal Service of a complaint of retaliation by Banani. Dkt. # 72, p. 4. That same day, Johnson informed Williams by email that she would be conducting a "formal interview" with him on March 5, 2008. Ex. 23.

29. On March 3 and 4, 2008, Postal Service managers Carlo Salazar, Pamela Cook and John Griffin submitted emails to James Guffey, listing "issues" with Williams. Exs. 21-26. None of these grievance were raised prior to Williams' February 20, 2008 protected activity and several were admitted at trial to constitute legitimate enforcement of safety regulations.

30. In a March 3, 2008 email to Guffey, Cook characterized Williams' decision to inform Banani of her rights rather than instruct her to discuss her grievance with management as having "put this company at risk." Ex. 21. Griffin also criticized Williams for safeguarding the privacy of complainants and acting on all anonymous complaints. Ex 26.

31. Griffins' March 4, 2008 email included a complaint regarding Williams' handling of a January 30, 2008 forklift incident, in which Williams was nearly struck by a speeding forklift driver. *Id.* Griffins' characterization of Williams as acting with hostility toward the driver is inconsistent with the contemporaneous reports of witnesses who described Williams' actions as appropriate and "necessary" to prevent injuries to other workers. Exs. 9-11. The forklift incident was resolved by early February, with retraining of the driver and issuance to him of a letter of warning. Trial Tr. Vol. 2, 86:24-88:8; Ex. 122, Supplemental Response to RFA No. 33.

32. On March 5, 2008, Johnson conducted the first of four investigative interviews of Williams. Johnson had neither received training to conduct an investigative interview nor previously subjected a

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

subordinate to one. Trial Tr. Vol. 2, 8:16-22. Johnson did not inform Williams of the purpose of the interview, and Williams experienced it as demeaning and stressful. *Id.* at 80:12-81:3.

33. In contrast to Johnson's interview of Williams, Postal Service investigative interviews routinely begin with an explanation of their purpose. Trial Tr. Vol. 3, 68:9-18.

34. On March 12, 2008, Johnson sent an email to the Postal Service's Western Area Safety Manager, characterizing Williams as having done "[e]verthing but dialing [OSHA] for [Banani]." Ex. 30.

35. On March 14, 2008, OSHA notified the Postal Service of a safety and health complaint made by one of its employees regarding an allergic reaction to certain equipment. Dkt. # 72, p. 4.

36. Also on March 14, 2008, Johnson sent Williams an email instructing him to spend the entire following week cleaning his office at the P&DC. Ex. 32. The email placed specific restrictions on Williams, among which it instructed him not to converse with craft employees, not to go onto the workroom floor unless directed or accompanied by Jacobus or Guffey, and not to leave the confines of his office, the restroom, cafeteria, or supply area unless directed. *Id.*; Ex. 34.

37. Restrictions on communications between a Safety Specialist and craft employees and on the Specialist's ability to walk the workroom floor are abnormal and would "hobble" the Specialist from understanding and investigating hazards, as per his or her role. Trial Tr. Vol. 3, 67:9-77:5.

38. On March 19, 2008, Williams accompanied OSHA inspectors on an inspection of the P&DC related to the allergic reaction complaint. The following day, Williams informed Johnson and Guffey that he had participated in the inspection.

39. On March 20, 2008, Johnson sent Williams an email reiterating his work restrictions and instructing him not to enter the workroom floor. Ex. 36.

40. Johnson conducted a second investigative interview with Williams on March 28, 2008, during which she questioned him about his interaction with Banani and inquired for the first time into his January 2008 interaction with the forklift driver. Dkt. # 72, p. 4.

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

41. On April 9, 2008, Johnson sent an email to the entire Safety Department instructing Williams to "do [his] part at the front desk (phones, etc.) and with processing accidents" and instructing him to give the password for his phone in the P&DC Safety Office to Carmen Dixon. Ex. 42. Thirteen minutes later, Johnson emailed Dixon instructing her to ask Williams for information regarding a Plant Safety Specialist's job duties, including "who takes care of the OSHA programs each year." Ex. 43.

42. On April 11, 2008, Johnson conducted a third investigative interview of Williams, again inquiring into his assistance to Banani. Dkt. # 72, p. 4. Williams found the interview degrading and stressful, and experienced stomach pains immediately following it.

43. Also on April 11, 2008, Johnson completed Williams' mid-year performance evaluation for fiscal year 2008. For the first time, Johnson identified defects in Williams' oral communication with Seattle P&DC personnel, characterizing communication with Williams as "difficult" and Williams as "uncooperative[]." Ex. 44. Five months prior, in his November 2007 performance evaluation, Johnson had ranked Williams as a "high contributor" in oral communication and remarked that he "is dedicated to Safety and continues to work on improving the Safety profile at the facilities he supports through communication." Ex. 4.

### D.  Williams' FMLA Leave

44. On April 11, 2008, following the third investigative interview, Williams requested and was approved for leave under the Family Medical Leave Act ("FMLA") for what he described as a "stress reaction." Dkt. # 72, p. 4.

45. According to Williams' treating physicians, Williams' stress began on February 26, 2008 and was exacerbated by the April 11, 2008 investigative interview. Ex. 45.

46. While on leave, Williams received medical treatment for symptoms including sleep and eating issues, headaches, depression, and stress. Williams began taking three to four medications to alleviate his symptoms. Williams had only previously met with a psychiatrist once following his brother's death

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

and had never previously been prescribed medications by a psychiatrist. Trial Tr. Vol. 2, 95:15-97:9; 98:13-99:5.

47. On April 18, 2008 Williams filed a whistleblower complaint with the Region X OSHA office in Seattle. On April 21, 2008, OSHA notified the Postal Service of Williams' complaint of retaliation. Dkt. # 72, p. 4.

48. On May 9, 2008, in response to a complaint that Williams had made through the National Association of Postal Supervisors ("NAPS"), Johnson wrote that the role of a Safety Specialist was to prevent OSHA complaints. Ex. 47.

49. Williams' physicians submitted letters to the Postal Service in May and July of 2008 seeking to extend Williams' medical leave. *Id.* at p. 5.

50. While on leave, Williams received multiple phone calls and certified letters from Johnson demanding to know how long he would be out and about the details of his leave, which he experienced as harassing. Trial Tr. Vol. 2, 100:14-23. Between June 28 and July 24, 2008, Johnson sent Williams three letters notifying him that the communications from his treating physician were insufficient and warning that his leave could be downgraded to annual, sick, or unpaid leave. Ex's. 53, 54, 59.

51. On July 11, 2008, Williams made a whistleblower complaint to OSHA asserting that the Postal Service was interfering with his medical leave in retaliation for his protected activities. OSHA notified the Postal Service of the complaint of retaliation on July 16, 2008. Dkt. # 72, p. 5.

52. On July 21, 2008, Williams' treating physician, Dr. Rutherford Hayes, sent a letter to the Postal Service clearing him to return to work and stating that it is important that Williams be permitted to work for a different supervisor based on the distress he had experienced. Ex. 57.

53. On July 24, 2008, Johnson notified Williams of her receipt of Dr. Hayes' letters and instructed him to request reasonable accommodation if he believed that he was disabled or to request a voluntary

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

downgrade to an open position. Johnson warned Williams that failure to respond "could result in an absence without leave status." Ex. 59.

54. On July 28, 2008, Williams attempted to return to work from his FMLA leave, whereupon he was called to a meeting with Johnson in Kosmicki's office. Williams' request that a NAPS representative be present was denied by Johnson, who informed him and Kosmicki that no discipline would result from the meeting. Trial Tr. Vol. 2, 101:3-17.

55. At the conclusion of the meeting, Johnson informed Williams that he had insufficient documentation to return to work. *Id.* at 102:1-14. That same day, she wrote Williams a formal letter notifying him that he would be placed on enforced leave after 30 days. The letter stated that Williams would remain on enforced leave until he was "able to furnish medical documentation to the satisfaction of management" showing that he was able to perform the duties of his position. Ex. 61.

56. Enforced leave is a disciplinary measure resulting in leave without pay. Labor Relations is required to be consulted regarding all disciplinary actions pertaining to EAS-level employees, including enforced-leave letters. Trial Tr. Vol. 3 at 63:8-16.

57. Labor Relations was not consulted in the decision to place Williams on enforced leave. *Id.* at 92:4-22.

58. On August 1, 2008, Williams requested an accommodation from the Postal Service's Reasonable Accommodation Committee to allow him to return to work for the Postal Service for a supervisor other than Johnson. Dkt. # 72, p. 5. Johnson responded directly to his request by letter on August 4, 2008, informing Williams that his request for accommodation was deficient and referencing the proposal to place him on enforced leave. Ex. 64.

59. It is atypical for a reasonable accommodations response to reference enforced leave. Trial Tr. Vol. 3, 97:18-25.

60. On August 29, 2008, the Postal Service placed Williams on enforced leave by Letter of Decision. Ex. 68. Labor Relations was not consulted in and did not author the letter.

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

61. Lacking income, Williams requested that his physician write a letter clearing him to return to work. He was cleared to work without restrictions or accommodations as of September 15, 2008. Ex. 69.

**E.  Issuance of a Letter of Warning**

62. On September 23, 2008, Johnson conducted her fourth investigative interview of Williams, again revisiting his interaction with Banani. Dkt. # 72, p. 5. During the interview, Johnson questioned Williams' loyalty and chastised him for spending time on the workroom floor with craft employees. Trial Tr. Vol. 2 106:2-107:6. She called Williams a "liar" and, as during the preceding three interviews, yelled at him and spoke in an antagonistic tone. *Id.* at 106:20-21.

63. Conducting more than two investigative interviews in relation to the same incident was unprecedented in the facilities where Williams worked. Trial Tr. Vol. 3, 70:7-21.

64. On October 3, 2008, Johnson issued Williams a Letter of Warning ("LOW"), which is a disciplinary action. Dkt. # 72, p. 5. The LOW was not written or approved by Labor Relations. The LOW informed Williams that he was in violation of several Postal Service policies, including its policy regarding "Loyalty." Ex. 71.

65. The presence of a LOW in an employee's personnel file can be a factor in hiring decisions. Trial Tr. Vol. 5, 30:10-14.

66. Williams' fiscal year 2008 performance review, completed by Johnson, ranked him for the first time as a "Non-Contributor" with respect to oral communication. Ex. 5.

67. Johnson awarded Williams a 5% Pay for Performance salary increase for the 2008 fiscal year. Dkt. # 72, p. 5.

**F.  Denial of Promotion to Manager of Safety**

68.  In March 2009, Williams accepted a detail assignment as an FMLA Coordinator, an EAS 18 position. *Id.* at p. 6. He did so in order to escape what he experienced as the unhealthy environment of the Safety Department.

69. In August 2009, Williams requested an opportunity to serve as Acting Manager of Safety after Johnson left her position. His request was denied. *Id.*

70. On September 2, 2009, Johnson sent an email to Laveda Padilla, Safety Analyst in the Western Area Postal Service office in Denver, Colorado. She described Williams' interest in the Acting Manager of Safety position as "[r]eally amusing considering our whole defense to his EEOs [sic] and 11c [sic] was that he was incompetent at his level 17 job and filed them to retaliate for being held accountable for performance." Johnson instructed Padilla to delete the communication. Ex 76.

71. On October 14, 2009, Williams applied for the Manager of Safety EAS 20 position. The selection review committee was comprised of MDO Cook (the committee chair), Kosmicki, and Renton Postmaster Evelyn Tan-Todd. The selecting official was Human Resources Manager Helen Pelton. Tan-Todd initially ranked Williams as one of the top three applicants but Cook and Kosmicki did not. Williams was not interviewed for the position.

72. Prior to making their selections, Kosmicki, Pelton, and Cook were aware of Williams' OSHA complaint and assistance to Banani. Kosmicki was also aware that Williams had been placed on enforced leave.

73. On October 14, 2009, the same day that Williams submitted his application, Pelton sent an email inquiring into Williams' EEOC complaints. Trial Tr. Vol. 5, 58:18-23.

74. During a conversation before Kosmicki conducted his review and evaluation of the candidates, Pelton (Kosmicki's direct supervisor) explicitly informed him that she did not want Williams to receive the promotion or to see his application again for a manager of safety position. She informed Kosmicki that Williams might be the most qualified candidate but that regardless she did not want him to have the job on account of his EEOC and whistleblower complaints. Trial Tr. Vol. 3, 112:24-113:10.

75. Kosmicki responded to Pelton that her comments were improper and asked to be taken off the committee. Pelton responded by making a motion across her mouth akin to a zipper shutting. Pelton did not permit Kosmicki to step down from the committee. *Id.* at 113:11-114:8.

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

76. Although Kosmicki had previously enjoyed a positive rapport with Pelton, Pelton began treating him in a less favorable way after their conversation. She publicly yelled at him and belittled him, became focused on criticizing him, and stopped consulting him on matters. *Id.* at 114:13-115:14.

77. Kosmicki subsequently filed two OSHA complaints, alleging retaliation in connection with his conversation with Pelton and in connection with his provision of information to OSHA investigator Rebecca Phillips during her investigation into Williams' complaints. *Id.* at 119:24-121:6; Ex.'s 88, 116.

78. Kosmicki made his Manger of Safety recommendations following his conversation with Pelton. He deemed Williams to be lacking minimum qualifications in two of eight categories: supervision of others and written communication. Ex. 84. Kosmicki testified that he may have been particularly harsh in his assessment of Williams and may have felt pressured by Pelton's instructions. Trial Tr. Vol. 3, 138:21-140:23.

79. Tan-Todd originally ranked Williams second among her top three candidates. Ex. 81. Following a conversation with Cook and email correspondence with Cook and Pelton, she changed Williams' ranking to fourth. Ex. 85. It was atypical for a selection committee head to communicate with the committee members prior to the members putting forth their recommendations.

80. On or about December 3, 2009, Williams learned that he was not selected for the Manager of Safety position. On December 28, 2009, Williams filed another whistleblower complaint with OSHA alleging that his non-selection for the Safety Manager position was in retaliation for protected activity. Dkt. # 72, p. 6.

81. On January 13, 2010, OSHA notified the Postal Service of Williams' complaint of retaliation related to his non-selection as Manager of Safety. *Id.*

82. In January of 2010, Williams' detail as an FMLA Coordinator was converted to a full-time position. *Id.*

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

83. On or about March 13, 2010, Williams was promoted to FMLA Coordinator, an EAS 18 position. Helen Pelton approved the decision to promote Williams. *Id.* at p. 7.

84. Although Williams did not have any difficulties with his new supervisor, he would have preferred to work in the Safety Department. Trial Tr. Vol. 2, 175:7-176:16.

85. In April 2011, the Postal Service consolidated all FMLA Coordinator positions in Greensboro, NC, including Williams' position. For family reasons, Williams opted to stay in Seattle and transfer to another position. Dkt. # 72, p. 7.

86. In January 2013, Williams obtained a detail and then permanent position as an EAS 18 Postmaster, stationed first in Blaine, WA and then in Point Roberts, WA near the Canadian border. *Id.* Williams resided in Point Roberts Monday through Friday in a mobile home in a recreational vehicle park. Purchase of the motor coach cost Williams $20,000, in addition to which he paid $350-450 per month in berthing fees for the year that he worked at Point Roberts. Trial Tr. Vol. 2, 117:21-119:10.

87. In January of 2014, Williams transferred to the Vehicle Maintenance Facility in South Seattle as an EAS 17 supervisor.

**G. Williams' Physical and Emotional Health**

88. Since his protected activity in February 2008 and as a result of the actions taken by the Postal Service against him, Williams has suffered a loss of self-esteem, motivation, and enjoyment of relationships and activities in his life. *See, e.g.*, Exs. 72, 92-108.

89. Williams' physical symptoms, as attested to by his treating physicians, include sleeping and eating problems, headaches, and stomach pain. *Id.*

90. Williams experienced public humiliation by his direct supervisors at the Postal Service following his protected activity. Postal Service managers made Williams the target of ridicule on account of his assistance to OSHA and commitment to workplace safety.

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

91. As a result of the actions taken against him by the Postal Service since February 2008, Williams has suffered depression, undergone psychiatric treatment, and taken four medications to cope. *Id.*

92. Williams took leave from work as a result of actions taken against him by the Postal Service following his protected activity and obtained professional assistance to regain functional capacity.

93. Dr. Brian Grant, a board-certified forensic psychiatrist, conducted an in-person evaluation of Williams' past and current mental health. Dr. Grant testified that Williams experienced mental health sequelae, primarily in the form of major depression and anxiety disorder with potential psychotic features following his February 2008 protected activity. Trial Tr. Vol. 4, 12:8-18, 41:7-12.

94. Dr. Grant further opined that any paranoid tendencies or stressors experienced by Williams prior to February 20, 2008 were likely exacerbated by actions taken against him by Postal Service managers to the point that he sought treatment and began taking medication for the first time. *Id.* at 19:15-20:12, 42:21-44:4.

95. Dr. Grant's testimony was unrebutted and the Court accords it substantial weight.

**H.  Postal Service Attitudes toward OSHA at Seattle P&DC and District Office.**

96. Several Postal Service managers, including Charles Kosmicki and former Plant Safety Specialist at the Seattle P&DC, Calvin Crumrine, testified to the animus among Postal Service senior management at the Seattle P&DC and District Office toward OSHA and employee complaints thereto.

97. Crumrine testified that Postal Service senior management tends to view OSHA as the "enemy" and prefers to keep OSHA out of Postal Service operations. Crumrine Dep., 48:19-49:24.

98. Kosmicki experienced acts of retaliation following his filing of an OSHA complaint, including being placed on enforced leave. Trial Tr. Vol. 3, 125:22-126:2. Kosmicki's OSHA complaint alleged that he was denied sick leave and his pay and staff were reduced in retaliation for providing information to OSHA investigator Phelps about Williams' treatment. *Id.* at 123:12-124:22.

99. Kosmicki's supervisor, Pelton's successor Dan Foster, informed him that Postal Service managers are not supposed to file complaints. *Id.* at 127:21-128:3. Foster explicitly questioned Kosmicki's loyalty to the Postal Service following his OSHA complaint. *Id.* at 128:12-17.

100. District Manager Katherine Nash instructed Kosmicki that "good soldiers don't sue their company." *Id.* at 128:4-8.

101. Senior Plant Manager Jacobus directly referred to Kosmicki, Williams, and another employee as a group of "malcontents." *Id.* at 127:11-20.

102. The Court finds the testimony of Crumrine and Kosmicki credible and accords their testimony significant weight.

103. Sue Fesler testified that as union steward at the P&DC, she frequently received grievances from employees who were disciplined for reporting accidents or unsafe conditions. Employees were consequently reluctant to file a complaint or accident report. Trial Tr. Vol. 1, 57:12-58:10.

104. The Court finds Fesler's testimony credible and assigns its significant weight.

105. Postal Service management at the Seattle facilities has demonstrated a propensity to put productivity over safety. Fesler, for instance, testified that Postal Service management routinely scheduled one person on a machine designed to be operated by two, leading to injuries and filing of employee grievances. *See id.* at 58:11-59:3. Manager of Safety Kaseman overheard Jacobus call him a pejorative name in response to Kaseman's attempts to enforce a safety rule at the Plant. Kaseman Dep., 154:22-157:9.

106. OSHA investigator Phelps experienced resistance by Postal Service managers in investigating Williams' complaints. Phelps testified that several managers she interviewed were rude, disrespectful, and uncooperative. Trial Tr. Vol. 1, 74:8-75:12. Based on what it determined to be the unusually egregious nature of Williams' treatment by the Postal Service, OSHA recommended punitive damages. *Id.* at 94:12-95:21.

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

1

**IV. CONCLUSIONS OF LAW**

2

**A.  The Postal Service has Violated Section 11(c) of the Act with respect to Arthur Williams**

3

4        Congress passed the Occupational Safety and Health Act of 1970 "to assure as far as possible

5 every working man and woman in the Nation safe and healthful working conditions…" 29 U.S.C. §

6 651(b). The Act effectuates this goal by, among various mechanisms, "encouraging employers and

7 employees in their efforts" to reduce workplace hazards and provide "safe and healthful working

8 conditions" and by "providing for appropriate reporting procedures with respect to occupational safety

9 and health." *Id.* at § 651(b)(1), (10). The Act, as safety legislation, is remedial and preventative in

10 nature and is to liberally construed to effectuate congressional purpose. *Reich v. Hoy Shoe Co., Inc.*,

11 32 F.3d 361, 368 (8th Cir. 1994) (citing *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 13 (1980)).

12        Aware of the inevitable shortage of safety and health inspectors available to supervise the

13 nation's multitudinous workplaces, Congress "placed great reliance on employee assistance in

14 enforcing the Act." *Marshall v. Whirlpool Corp.*, 593 F.2d 715, 722 (6th Cir. 1979), aff'd 445 U.S. 1

15 (1980). To that end, Section 11(c) of the Act provides:

16        No person shall discharge or in any manner discriminate against any employee because
17        such employee has filed any complaint or instituted or caused to be instituted any
         proceeding under or related to this chapter or has testified or is about to testify in any
18        such proceeding or because of the exercise by such employee on behalf of himself or
         others of any right afforded by this chapter.

19 29 U.S.C. § 660(c)(1). Section 11(c) functions to safeguard employees against adverse actions taken

20 on account of their engagement or suspected engagement in activity protected under the Act, thereby

21 ensuring that health and safety violations will be reported. *See Reich*, 32 F.3d at 368. The Act, in turn,

22 authorizes the Secretary of Labor to bring an action in federal district court upon the filing and

23 investigation of a complaint by an employee who believes that he or she was discharged or

24 discriminated against in violation of Section 11(c). 29 U.S.C. § 660(c)(2). Coverage under Section

25

26

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

11(c) is not disputed in this case: the Postal Service is a "person" subject to the Act and Williams is an employee entitled to the Act's protections. 29 U.S.C. §§ 652(4)-(6).

Under Section 11(c) of the Act, "[a]n employer 'discriminates' against an employee only when he treats that employee less favorably than he treats others similarly situated." *Whirlpool Corp.*, 445 U.S. at 19. To prevail on a claim under Section 11(c), the Secretary must prove each of the following elements by a preponderance of the evidence: (1) the claimant employee participated in protected activity, (2) the employer subsequently subjected the employee to an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse action. *Reich*, 32 F.3d at 365. Evidence establishing each element may be direct or circumstantial. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003); *see Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003).

At the trial stage, the Secretary bears the ultimate burden of proof "to show by a preponderance of the evidence that the challenged employment decision was 'because of' discrimination." *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 856-57 (9th Cir. 2002) (en banc), aff'd 539 U.S. 90 (2003). If the Secretary proves his case in chief, he prevails if the finder of fact determines that discriminatory animus is the sole cause for the challenged employment actions. *Costa*, 299 F.3d at 856. By contrast, the employer prevails if it establishes that discrimination played no role in the challenged decisions. *Id.*

The employer may also defend by showing that it possessed a legitimate, non-discriminatory reason for taking the adverse actions against the complaining employee. *Id.* Where the employer has articulated mixed motives for taking the adverse actions, the employer may avoid liability only by proving that the employment decisions at issue would have been the same even if discrimination had played no role. *Lam v. Univ. of Haw.*, 40 F.3d 1551, 1564-65 (9th Cir. 1994); *Costa*, 299 F.3d at 856-87. The burden is on the employer to make this showing as an affirmative defense. *Lam*, 40 F.3d at 1564-65 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 246 (1989)).

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

In this case, due to the Postal Service's spoliation of evidence in conscious disregard of its preservation duties, the Court has drawn a rebuttable inference against the validity of the Postal Service's performance-related justifications for adverse action taken with respect to Williams following his protected activities. Dkt. # 66, 71. That is, the Court draws an adverse inference against the Postal Service that its treatment of Williams was not motivated by alleged performance issues pre-dating his protected activities. *Id.*

The Court finds that the Secretary has established by a preponderance of the evidence that the Postal Service retaliated against Arthur Williams in various ways because of Williams' protected activities. The Court further finds that the Postal Service failed to carry its burden to prove that it would have taken any of the myriad adverse actions against Williams in the absence of his protected activities.

**(1) Williams engaged in activities protected by the Act**

Section 11(c) protects an employee from retaliation on the basis of filing a complaint, testifying with respect to a Section 11(c) proceeding, or exercising any right afforded by the Act on behalf of himself or others. 29 U.S.C. § 660(c)(1). The scope of rights protected implicitly and explicitly under the Act is broad. *See, e.g.*, 29 C.F.R. § 1904.36 (prohibiting retaliation for reporting workplace injury).

It is undisputed that Williams engaged in the following protected activities within the meaning of the Act: (1) assisting Naseem Banani on February 20, 2008; (2) accompanying OSHA inspectors on an inspection of the P&DC on March 19, 2008; (3) filing a whistleblower complaint with OSHA on April 18, 2008; (4) filing a whistleblower complaint with OSHA on July 11, 2008 alleging retaliatory interference with his medical leave; (5) filing a whistleblower complaint with OSHA on December 28, 2008 alleging that his non-selection for the Safety Manager position was retaliation for protected activity; and (6) filing a whistleblower complaint on March 16, 2011 alleging that Human Resource Manager Pelton harassed him in retaliation for protected activity.

**(2) Adverse Actions were taken against Williams**

In order to meet its burden to show an adverse employment action, the DOL "must show that a reasonable employee would have found the challenged action materially adverse," which means that the action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation omitted). Materiality of the alleged harms is judged by an objective standard accounting for the particular circumstances under which they occurred. *Id.* To be materially adverse, an action need not rise to the level of an ultimate employment action, such as discharge, change in job title, or reduction in pay. *See Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir. 2000); *Burlington Northern*, 548 U.S. at 64 (providing that materially adverse actions are not "limited to discriminatory actions that affect the terms and conditions of employment"). Rather, actions such as a lateral transfer, an unfavorable job reference, or a change in work schedule may be sufficiently severe under the circumstances to deter a reasonable employee from complaining about discrimination. *Id.*; *Ray*, 217 F.3d at 1242-43.

The Court finds that the Postal Service subjected Williams to several discrete adverse actions, as well as an actionable hostile work environment.

**a)   Transfer and Demotion as Plant Safety Specialist at the P&DC**

The Court finds that Williams' lateral transfer from the P&DC to the Queen Anne District Office on or about February 26, 2008 rose to the level of an adverse employment action. This transfer, which followed within a week of Williams' assistance to Banani, stripped Williams of the bulk of his professional responsibilities, replaced them with the menial tasks of checking emails and cleaning his office, and relocated Williams to an insufficiently equipped administrative desk and subsequently an under-heated storage closet. Although Williams' job title did not change, his transfer constituted a de facto demotion. *See Kessler v. Westchester Cnty. Dept. of Social Services*, 461 F.3d 199, 209-210 (2d Cir. 2006). The Court finds that the circumstances of this action, including its abrupt, public, and

humiliating nature, would deter a reasonable employee from exercising his rights under the Act. *Id.*; *Burlington Northern*, 548 U.S. at 67-68.

### b) Multiple Investigative Interviews

The Court finds that the four investigative interviews of Williams by Johnson rose to the level of an adverse action. Ordinarily, participation in investigative interviews, standing alone, does not constitute punishment or harm sufficient to deter a reasonable employee from engaging in protective activity. *See Ballard v. Donahoe*, 2014 WL 1286193, *12 (E.D. Cal. 2014); *Lee v. Hawaii*, 2010 WL 235009, at *7 (D. Haw. 2010). Investigative interviews may, however, rise to an actionable level where they lead to an adverse consequence or where the attending circumstances show that a reasonable person subjected to them would be dissuaded from complaining about discrimination. *See Ballard*, 2014 WL 1286193 at *12 (recognizing that "an investigative interview can be deemed adverse if it leads to an adverse consequence"). Such is the case here.

It is undisputed that Johnson conducted four discrete investigative interviews of Williams on March 5, 2008, March 28, 2008, April 11, 2008, and September 23, 2008.  Excluding the period of his medical leave, Williams was interviewed about his assistance to Banani four times in the course of seven weeks of work. In contravention of Postal Service practice, none of the interviews was preceded by an explication of its purpose and each was carried out in an offensive and antagonistic manner. The number of interviews, all focused on a single incident, was unprecedented in the facilities where Williams worked. Johnson's tone toward Williams was hostile, accusatory, and humiliating. She consistently yelled at and berated him during the interviews for his protected activity and questioned his loyalty to the Postal Service. The treatment was sufficiently severe that Williams was compelled to seek medical leave on the same day that his third investigative interview took place. Further, Johnson failed to inform Williams that the interviews could lead to disciplinary actions. Johnson nonetheless issued Williams a Letter of Warning ten days after his fourth interview, and shortly after his return from enforced leave, which negatively impacted his personnel record.

Under these circumstances, the Court finds that the four investigative interviews were of a sufficiently hostile and punitive nature, leading to adverse employment and health consequences for Williams, such that they would dissuade a reasonable person in his position from lodging a complaint of discrimination.

**(c) October 3, 2008 Letter of Warning and Negative Performance Evaluations**

The Court finds that the October 3, 2008 LOW issued to Williams as well as his negative fiscal year 2008 performance review constitute adverse actions. The Postal Service considers the issuance of a LOW to be a disciplinary action. The LOW was neither written nor approved by Labor Relations in contravention of Postal Service policy requiring that Labor Relations be involved in discipline administered to EAS employees. It further contained unwarranted accusations, such as its assertion that Williams was in violation of the Postal Service's loyalty policy. *See* Ex. 71. The LOW remains in Williams' work file, negatively affecting his personnel record.

Johnson's ranking of Williams in his 2008 fiscal year performance review as a "Non-Contributor" in oral communications was similarly undeserved. Johnson had ranked Williams as a "High-Contributor" in this category in November 2007, and Williams had never received less than a satisfactory ranking on any performance category. The Court finds that the issuance of an unwarranted, negative performance review would be reasonably likely to deter an employee in Williams' position from engaging in protected activity. *See Boswell v. Potter*, 51 Fed.Appx. 661, 663 (9th Cir. 2002) (unpublished decision) (Postal Service "[l]etters of warning placed in the employee's personnel file are likely to deter employees from engaging in protected activity") (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)); *Yartzoff*, 809 F.2d at 1376 ("[U]ndeserved performance ratings, if proven, would constitute 'adverse employment decisions[.]'").

**(d) Failure to Promote Williams to Manager of Safety Position**

The Court finds that the Postal Service's refusal to consider Williams for the Manager of Safety position constitutes an adverse action. Where an employee alleges retaliatory refusal to hire or

promote, the plaintiff must show that the "position for which she applies was eliminated or not available to her because of her protected activities. Her 'adverse employment decision' is the closing of the job opening to her and the loss of opportunity even to compete for the position." *Ruggles*, 797 F.2d at786. In this instance, a preponderance of the evidence shows that Williams was denied the possibility to compete for the Manager of Safety position. His submission of an application was openly mocked by his supervisors. The selecting official, Pelton, directly informed committee member Kosmicki that Williams was not to be considered for the promotion regardless of his qualifications. Committee member Tan-Todd's deletion of Williams' name from her list of recommended candidates following her conversations with Pelton provides further circumstantial evidence of management's intent to keep Williams out of the candidate pool. The denial of the opportunity to fairly compete for the position, rendering the promotion unattainable, would dissuade a reasonable employee from exercising his or rights under the Act.

### (e) Williams' Subjection to a Hostile Work Environment

Both parties agree that the creation of a hostile work environment is cognizable as a material adverse action for the purposes of a Section 11(c) claim. *See* Dkt. ## 68, 70. The Court is in accord.

It is well-settled that Title VII of the Civil Rights Act of 1964 is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult,…that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Harris v. Forklift Systems*, 510 U.S. 17 (1993). The Ninth Circuit has held that a hostile work environment claim is cognizable under Title VII's anti-relation provision. *Ray*, 217 F.3d at 1244-45; *see also Komis v. U.S. Dep't of Labor*, 2014 WL 3437658 (E.D. Pa. 2014) (recognizing a retaliatory hostile work environment claim under Title VII and explaining case law).

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

In light of the substantial similarities between the statutes, courts routinely import principles developed in the Title VII context into Section 11(c) analyses.[1] *See, e.g.*, *Schweiss v. Chrysler Motors Corp.*, 987 F.2d 548, 549 (8th Cir. 1993) (adopting principles applied to retaliation cases in other federal employment discrimination statutes to analyze a retaliation claim under the Act); *Donovan v. Hahner, Foreman & Harness*, 763 F.2d 1421, 1423 (10th Cir. 1984) (applying Title VII equitable tolling law to Section 11(c)); *Renaissance Arts & Educ., Inc.*, 2013 WL 5487097, *5 (applying Title VII laches precedent to Section 11(c) claim because of the "close resemblance of Title VII cases to OSHA proceedings").

The Court finds it appropriate to analogize from the Title VII context for the purpose of recognizing a retaliation claim based on a hostile work environment theory brought under Section 11(c). Doing so is consistent with the broad construction given Section 11(c) by the courts in order to protect employees in asserting their rights and to advance the salutary objectives of the Act. *Marshall*, 593 F.2d at 722.[2]

To succeed on a hostile work environment theory of liability, a plaintiff must show that the employer's actions were "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112-13 (9th Cir. 2014) (citation omitted). "It is enough if such hostile conduct pollutes the victim's workplace, making it more difficult for [him] to do [his] job, to take pride in [his] work, and to desire to stay on in [his] position." *Id.* Discrete acts that are independently actionable as adverse

---

[1] Title VII's anti-retaliation provision provides, in relevant part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees…because he opposed any practice made an unlawful employment practice…or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

[2] The Court also accords deference to the Secretary's interpretation of the Act to prohibit reprisals in the form of a hostile work environment, as manifested through OSHA's Whistleblower Enforcement Manual, Chp. 3, VI.3, and the Department of Labor's promulgated regulations. *See* Dkt. # 69, Ex. A, p. 9; *see also* 29 C.F.R. § 1977.1(d) (interpreting Section 11(c) to "prohibit[] reprisal, in any form, against employees who exercise rights under the Act."); *Whirlpool Corp.*, 445 U.S. at 11 (providing that a Department's regulation is "entitled to deference unless it can be said not to be a reasoned and supportable interpretation of the Act").

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

employment actions can simultaneously constitute a hostile work environment so long as they are adequately connected to each other as part of the same unlawful employment practice and together meet the hostile work environment standard. *Baird v. Gotbaum*, 662 F.3d 1246, 1252-53 (D.C. Cir. 2011). The work environment must be both subjectively and objectively hostile, viewed from the perspective of a reasonable person in the victim's position. *McGinest*, at 1113. To satisfy the material adversity element of his retaliation claim, a plaintiff must show that the hostile work environment was sufficiently severe to dissuade a reasonable person from making a complaint. *See, Bergbauer v. Mabus*, 934 F.Supp. 2d 55, 81-82 & n. 25 (D.D.C. 2013); *Komis*, 2014 WL 3437658 at *3.

In this case, the Court finds that Williams has suffered severe and pervasive harassment sufficient to alter the conditions of his employment and create an abusive working environment. Beginning with his initial protected activity on February 20, 2006, the Postal Service initiated a consistent string of harassing conduct aimed at Williams. Discrete instantiations of such harassment include: Williams' precipitous transfer to the District Office; his relocation to an under-equipped administrative desk in an open area and subsequently to an under-heated Labor Relations storage closet; the near complete curtailment of his job duties; extraordinary prohibitions placed on his ability to accompany OSHA inspections, to communicate with craft employees, to move freely around the workplace, and to investigate safety incidents as is part and parcel of his position; his subjection to four hostile investigative interviews; frequent communications, both written and oral, from his supervisors questioning Williams' loyalty to the Postal Service; subjection of Williams' to public humiliation; antagonistic treatment during Williams' FMLA leave; placement of Williams on enforced leave without pay, a disciplinary measure; issuance of a LOW placing Williams in violation of the Postal Service "Loyalty" policy; undeserved mid-year and 2008 fiscal year performance reviews; and the denial of the opportunity to compete for promotion to a Manager of Safety position.

The Court finds these actions objectively hostile in their severity and pervasiveness. The Court further finds that Williams subjectively viewed and experienced these actions as offensive and

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

harassing, personally and professionally, as evidenced by his taking of medical leave, his need for psychological therapy and medications, and his filing of multiple OSHA complaints. The Court has little trouble finding that a reasonable person in Williams' position would be deterred from asserting his rights under the Act by conduct as pervasive and humiliating as that which he experienced and the polluted workplace atmosphere to which he was, for years, subjected. Accordingly, the Court determines that Williams was subjected to a hostile work environment constituting an adverse employment action within the meaning of the Act.

**(3)  The adverse actions taken against Williams were caused by his protected activities**

The Secretary has demonstrated by a preponderance of the evidence that Williams' protected activities were a "substantial reason" for the aforementioned adverse actions. 29 C.F.R. § 1977.6(b); *see Solis v. Consol. Gun Ranges*, 2011 1215028 (W.D. Wash. 2011).

Plaintiff may show causation through both direct and circumstantial evidence. Direct evidence is that which "if believed, proves the fact of discriminatory animus without inference or presumption." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) (internal quotation and alteration omitted). Direct evidence includes statements demonstrating hostility toward a protected status. *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 662 (collecting cases). Circumstantial evidence may also be used to show causation, provided that the evidence "give[s] rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Temporal proximity between protected activity and subsequent adverse actions can constitute sufficient circumstantial evidence. *See Dawson v. Entek Intern.*, 630 F.3d 928, 937 (9th Cir. 2011).

In this case, there is both direct and circumstantial evidence sufficient to support a casual connection between Williams' protected activities and the subsequent adverse actions taken against him.

**(a)  Direct Evidence**

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

The Court finds credible Charles Kosmicki's testimony that his supervisor, Helen Pelton, expressly stated that she did not want Williams to receive the Manager of Safety promotion, regardless of Williams' qualifications, on account of his OSHA and EEOC complaints. Kosmicki's testimony is consistent with two prior, signed statements regarding this conversation, both attributing Pelton's animus toward Williams' application to his protected activity. *See* Exs. 88, 116. The Court finds Pelton's denial of the substance of this conversation to be lacking credibility. Based on the direct evidence of animus on the part of the Selecting Official with ultimate authority over the promotion in question, the Court finds that the Postal Service eliminated the position as to Williams because of his protected activities. *Ruggles*, 797 F.2d at 786; *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, (9th Cir. 2005) ("Where…the person who exhibited discriminatory animus influenced or participated in the decisionmaking process, a reasonable factfinder could conclude that the animus affected the employment decision.").

The Court finds other direct evidence of discriminatory animus toward Williams on account of his protected activities, including the following statements from Williams' managers: (1) Jacobus' February 26, 2008 email to Williams chastising his "continuing and obvious interest in representing the bargaining unit;" (2) Cook's March 3, 2008 email to Guffey describing Williams as having "put this company at risk" by "inform[ing] the employee of her rights" rather than instructing Banani to speak with management impervious to her health concerns; (3) Johnson's March 12, 2008 email to Postal Service's Western Area Safety Manager, stating that Williams had done "[e]verything but dialing [OSHA] for [Banani]; (4) Johnson's testimony and written statement of May 9, 2008, stating that the purpose of a Safety Specialist is to prevent OSHA complaints; and (5) Johnson's September 2, 2009 email to the Western Area Safety Analyst describing Williams' interest in the Acting Manager of Safety position as "[r]eally amusing" in reference to his OSHA complaints. The Court also heard credible testimony at trial that Postal Service senior managers in the Seattle P&DC and District Office regard employee complaints to OSHA with hostility. These statements, startling in their magnitude

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

and blatancy, demonstrate animus toward Williams' attempts to promote safety in the workplace and exercise rights assured by the Act on behalf of himself and others. *See Aragon,* 292 F.3d at 662 (noting that "[p]articularly because employers know better, direct evidence of employment discrimination is rare").

### (b) Circumstantial Evidence

Extensive circumstantial evidence in this case also supports the Court's finding of a causal relationship. The temporal proximity between Williams' protected activities and these adverse actions creates a strong inference of causation. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity."). This temporal proximity can itself constitute sufficient circumstantial evidence of retaliation. *Bell v. Clackamas Cnty.*, 341 F.3d 858, 865 (9th Cir. 2003).

Here, the Postal Service began taking adverse actions against Williams within one week of his assistance to Banani. On February 26, 2008, six days after Williams assisted Banani and one day after Banani filed her OSHA complaint, the Postal Service relocated Williams to the District Office, stripping Williams of his duties and transferring them to a lower level employee. On March 5, 2008, two weeks after Williams met with Banani, the Postal Service subjected Williams to his first hostile investigative interview. On March 14, 2008, the Postal Service restricted his duties to cleaning his P&DC office and imposed extraordinary limitations on his movement in the P&DC. The Postal Service reiterated these restrictions to Williams on March 20, 2008, the same day that Williams informed his supervisor that he had participated in an OSHA inspection. Within two months of his initial protected activity, Williams was subjected to two more hostile investigative interviews and received an unprecedentedly negative performance review. Within three weeks of Williams' filing of an OSHA complaint, Williams was warned that he would be placed on enforced leave. Enforced leave was instituted on August 29, 2008, one and a half months after Williams filed his complaint. A month

later, on September 23, 2008, Williams was subjected to a fourth hostile investigative interview and issued a LOW shortly thereafter.

The Court finds the various negative references to Williams' "loyalty" in connection to his protected activities to produce another strong inference of retaliatory animus. These references including Johnson's repeated questioning of Williams' loyalty to the Postal Service during investigative interviews in connection to his assistance to Banani, as well as the issuance of a LOW citing Williams' purported violation of his duty of "Loyalty." The Court finds these references to Williams' "loyalty" to constitute a thinly veiled reference to his assistance to Banani in asserting her rights under the Act. The Court infers from these references that the investigative interviews were held and the LOW was issued because of Williams' protected activities. *See Kessler*, 461 F.3d at 210 (finding that the questioning of plaintiff's "loyalty" on the heels of his protected activities "undercut[] defendants' contention that there is no proof as to causation").

Additional circumstantial evidence is found in the Postal Service's deviation from its own policies and procedures with regard to Williams. Such deviations provide circumstantial evidence of retaliatory intent. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1117 (9th Cir. 2011). Labor Relations was not consulted for, and did not issue any, disciplinary actions taken against Williams, including enforced leave and the LOW. Johnson also failed to follow Postal Service policy and procedure to inform Williams of the purpose of the investigative interviews and explain that they could lead to discipline. Johnson further refused to permit Williams a NAPS representative at his July 28, 2008 meeting, even though it ultimately led to enforced leave. Finally, Pelton deviated from typical selection review committee protocol by communicating with committee members regarding candidates prior to their recommendations.

The Court finds that the Secretary has clearly demonstrated by a preponderance of the evidence that these adverse actions individually, as well as the hostile work environment that they contributed to producing, were caused by retaliatory animus to Williams' protected activities. *See, e.g.,*

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

*Hoy Shoe Co., Inc.*, 32 F.3d at 365-67 (finding causation where employer suspected that employee filed OSHA complaint and shortly thereafter took retaliatory action based on that suspicion). In particular, this hostile work environment extended beyond the discrete acts of retaliation delineated above to create an atmosphere imbued with ridicule and hostility that permeated Williams' working environment for several years. It continued throughout the course of Williams' six discrete protected activities from February 20, 2008 through March 16, 2011. The evidence presented by the Secretary, including the temporal overlap between Williams' protected activities and his subjection to a hostile work environment, is sufficient to show that the Postal Service intended to retaliate against Williams because of his protected activity and subjected him to a hostile work environment as a result, continuing through his departure from the Postal Service safety division in the spring of 2010. *See Gowski v. Peake*, 682 F.3d 1299, 1313-14 (11th Cir. 2012) (upholding jury's verdict on retaliatory hostile work environment where testimony showed that retaliatory intent was well-known and continued over a period of years).

**(4) The Postal Service Failed to Meet its Burden to Prove its Affirmative Defenses**

Where, as here, the employer defends by offering evidence that it had legitimate, non-discriminatory reasons for taking adverse actions, it bears the burden to prove that its employment decisions would have been the same in the absence of the employee's protected activities. *See Costa*, 299 F.3d at 856-87. The Court finds that the Postal Service has failed to carry its burden to make this showing.

Plaintiff has presented evidence sufficient to show that the Postal Service's non-retaliatory reasons for taking adverse actions against Williams were pretext. The Postal Service introduced evidence that Williams' supervisors took actions against him because of concerns with his performance, specifically with his oral communication abilities. They pointed, for instance, to grammatical errors in Williams' communications, his demeanor in stopping an unsafe forklift driver, the disorganized state of his office, and his purportedly excessive concern with process. However, the

Postal Service's reliance on these reasons is undermined by the fact that Williams was not informed about any of these professed performance problems prior to his assistance to Banani. *See Little v. Technical Specialty Prods., LLC*, 2014 WL 1116895, *4 (E.D. Tex. 2014) (plaintiff's evidence that he was not informed of performance problems prior to termination supported finding of pretext). To the contrary, the forklift incident was completely resolved with a LOW issued to the driver, not to Williams, and none of Williams' pre-2008 performance reviews reflected worrisome defects in his performance abilities. Other purported performance defects ironically pertained to Williams' efforts to ensure workplace safety, in furtherance of his job duties and the goals of the Act. These reasons are illegitimate grounds for taking adverse actions and underscore the Postal Service's hostility toward prioritizing workplace safety precautions.

Further, the Postal Service only began compiling a list of purported issues with Williams on March 3, 2008, shortly after his assistance to Banani and on the same day that the Postal Service received notification of Banani's own complaint of retaliation to OSHA. While Jacobus testified that he had been displeased with Williams' work performance for roughly six months, the Postal Service failed to proffer evidence to corroborate this claim, and the Court does not find it credible. On the contrary, the first written complaint Jacobus lodged regarding Williams was on February 26, 2008, and directly suggested Jacobus' animus toward Williams' efforts to assist bargaining unit employees in asserting their rights under the Act. *See* Ex. 17. The Court infers that this assertion of Williams' performance issued on the heels of his protected activities was designed to disguise illegitimate retaliatory motives and to serve as a post hoc justification for adverse actions taken against him. *See Dage v. Time Warner Cable*, 394 F.Supp.2d 668, 678-79 (S.D. Ohio 2005).

The Court also finds that the Postal Service has failed to carry its burden to show that the hiring committee's decision not to promote Williams to the Manager of Safety position would have been the same in the absence of his protected activity. The individual who was ultimately rewarded the promotion, Jacquelyn Spencer-Muck, was less experienced in safety roles. After Williams engaged in

protected activity, his supervisors began to put forward less experienced employees, like Carmen Dixon and Spencer-Muck, to fill in the duties that they were preventing Williams from carrying out. While Spencer-Muck was regarded by the members of the selection committee as having greater managerial experience, her experience resulted from her selection as Acting Manager of Safety. The evidence shows that Williams was denied the opportunity to compete for this position as well, as demonstrated by Johnson's email describing Williams' expression of interest in the position as "[r]eally amusing." Ex. 76. Spencer-Muck was selected for the role despite having no prior experience in the Safety Department. The Court also finds credible Kosmicki's testimony that his perceptions and ultimate ratings of Williams' qualifications for the position may have been influenced by his conversation with Pelton. Accordingly, the Postal Service has not shown that, in light of his many years of experience, upward trajectory, and positive performance ratings prior to his protected activity, Williams would not have been the more qualified and preferred candidate for both the acting and permanent Manager of Safety positions.

As to Plaintiff's hostile work environment theory of liability, the Supreme Court has held that no affirmative defense is available when "the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Faragher v. City of Boca Raton*, 524 U.S 775, 808 (1998). Here, the Court finds that Williams' de facto demotion following his abrupt transfer to the District Office is sufficient to constitute a tangible employment action. Even if it were not, the Postal Service has failed to carry its burden to prove its affirmative defense by a preponderance of the evidence. Where no tangible employment action has been taken, an employer may interpose an affirmative defense to defeat liability on a hostile work environment claim by proving: (1) that the employer exercised reasonable care to prevent and correct promptly any discriminatory conduct, and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities. *Id.* at 807; *see also McGinest*, 360 F.3d at 1119 n. 12. In this case, the Postal Service has offered no evidence that it took any remedial steps to prevent the pervasive

harassment of Williams. Indeed, some of the principal instruments of the Postal Service's retaliation against William have been promoted and have remained in positions with significant authority over the Postal Service's employees.

In short, the evidence shows that the Postal Service launched a campaign to punish Williams as a direct consequence of his assertion of rights protected under the Act. These acts, discretely and cumulatively, rendered Williams' workplace hostile and harassing and resulted in his de facto demotion, public humiliation, and lack of career advancement, as well as fiscal, physical, and psychological harms. As the Postal Service has failed to carry its burden to prove by a preponderance of the evidence that these adverse actions would have resulted absent Williams' protected activities, the Court finds the Postal Service liable for retaliating against Williams in violation of Section 11(c) of the Act.

**B. Economic and Non-Economic Damages**

Based on the foregoing conclusions, the Court finds that Williams is entitled to economic and non-economic damages from the Postal Service to compensate him for his losses.

Section 11(c) provides for recovery of compensatory damages. The Act provides that a court may "order all appropriate relief" including back pay. 29 U.S.C. § 660(c)(2). *See Reich v. Cambridgeport Air Systems, Inc.*, 26 F.3d 1187, 1195 (1st Cir. 1994) (holding that Section 11(c) provides district courts with the "statutory power to award 'all appropriate relief'" including "compensatory and even such traditional other relief as exemplary damages" up to twice the employees' pay).

As far as Williams' economic losses, the Secretary has carried its burden to prove that Williams incurred $1,346.81 in medical expenses. Ex. 167. Williams shall be compensated for this loss in its entirety.

The Secretary has also shown that Williams was denied promotion to the Manager of Safety position, at an EAS 20 level, in December 2009. As the Postal Service does not utilize a strict pay

scale for EAS-level employees, the Court finds a reasonable measure of compensatory damages for the failure to promote Williams to be the difference between Spencer-Muck's and Williams' pay during the period December 5, 2009 to trial. Based on the evidence of wages proffered by the Secretary, the pay differential between the two employees fluctuated between $26 per day and $33 per day, varying with the employees' staggered wage increases. Multiplying the difference in wages by the number of applicable days in the pay period to which it pertained, the Court calculates Williams' total lost wages from denial of promotion through trial to amount to $60,814. The Court finds this sum to be a reasonable compensatory measure supported by the evidence and shall award it in full.

The Court additionally finds that Williams incurred significant expenses due to taking the only job available to him with the Postal Service: postmaster in Point Roberts, Washington. Williams was required to rent a berth for his motor coach at a cost of approximately $400 per month, for one year, resulting in $4,800 of expenses. Williams was also required to commute approximately 200 miles each way from his weekly station in Point Roberts to his family home in Seattle, at an estimated cost of $.55 per mile, leading to $11,400 of travel expenses over 52 weeks.[3] But for the failure to promote Williams within the Safety department, these expenses would not have been incurred. Accordingly, the Court shall award Williams $16,200 to compensate for expenses occurred for his year at Point Roberts. *See Marshall v. P&Z Co., Inc.*, 1978 WL 17187 (D.D.C. 1978), aff'd sub nom, *Marshall v. P&Z Co., Inc.*, 600 F.2d 280 (D.C. Cir. 1979) (awarding travel costs incurred in finding a new job for a violation of Section 11(c)).

---

[3] The Court declines to award requested compensatory damages beyond those supported by the evidence. While the Secretary requests compensation for travel expenses incurred over a 70-week period, the evidence only supports compensation for the 12-month period during which Williams incurred rental fees at Point Roberts. The Secretary has requested an additional award of $20,000 to compensate Williams for a purchase of a motor coach. However, Plaintiff has failed to introduce evidence sufficient for the Court to find that Williams' position in Point Roberts necessitated this purchase, that but for his relocation to Point Roberts the purchase would not have been made, and that Williams was not able to recoup these expenses following his relocation to Seattle in January 2014. The Court accordingly finds the requested motor coach compensation to be speculative and declines to award it to avoid providing Williams with a windfall.

Accordingly, Williams' economic losses resulting from the Postal Service's retaliation against him amount to $78,360.81. Analogizing from the Title VII context, the Court finds it appropriate to award Williams prejudgment interest on this amount to compensate him for the lost time value of his wrongfully withheld and unnecessarily expended earnings. *See Loeffler v. Frank*, 486 U.S. 549, 564 (holding that prejudgment interest may be awarded in a suit against the Postal Service under Title VII); *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1446 (9th Cir. 1984) (holding that prejudgment interest on a back pay award in a discrimination case is appropriate). While the rate of prejudgment interest is within the discretion of the trial judge, the Court agrees with the Secretary that it is appropriate to use the 52-week U.S. Treasury Bill rate prescribed for post-judgment interest in 28 U.S.C. § 1961(a). *See W. Pac. Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1288-89 (9th Cir. 1984) (providing that the T-bill rate is appropriate for prejudgment interest "unless the trial judge finds, on substantial evidence, that the equities of the particular case require a different rate"). The Court applies the applicable interest rate for the calendar week preceding entry of judgment, or .21%, compounded annually. The Court calculates the total economic award, including prejudgment interest, at $79,228.60, which shall be awarded in full.

Williams has also suffered extensive emotional distress as a result of the Postal Service's actions.  The record demonstrates that, prior to assisting Banani on February 20, 2008, Williams was steadily progressing toward achieving his goal of becoming a manager in the Safety Department. He received positive performance reviews and was consistently promoted to positions with greater safety responsibility. Through its campaign to punish Williams for his protected activities, the Postal Service has not only thwarted Williams' career ambitions, but it has caused him to suffer severe emotional distress. His distress has manifested in a range of physical responses, including stomach problems, sleeplessness, anxiety, and depression. Williams has also sought and received significant medical treatment for his distress, including extensive talk therapy and psychiatric medication. He took five months of leave from the Postal Service to escape the punitive atmosphere, returning when forced to

and enduring continuing maltreatment by his managers thereafter. Unrebutted expert testimony at trial established that Williams' emotional distress was caused by the Postal Service's treatment of him. Accordingly, the Court shall award Williams $150,000 in non-economic damages for his emotional distress. *See Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 513 (9th Cir. 2000) (approving $1,000,000 for emotional distress damages for retaliation claim brought under Title VII and Washington state law based on the testimony of plaintiff and her husband).

### C.   Equitable Remedies Regarding Williams' Personnel Record and Denial of Promotion

The Act provides for broad equitable relief in order to remedy past wrongs and prevent their repetition under the rubric of "all appropriate relief." *See Cambridgeport Air Sys., Inc.*, 26 F.3d at 1191 (all appropriate relief in Section 11(c) "embraces monetary damages as well as other relevant forms of relief normally available"); *see also Huto v. Finney*, 437 U.S. 678, 687 (1978) ("Once invoked, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.") (internal citation omitted). Courts have found that appropriate relief includes reinstatement, expunging negative employment references, and posting notice. *See, e.g.*, *Marshall v. Wallace*, 1978 WL 18639, *4 (M.D. Penn. 1978).

The Secretary requests that the Court order the Postal Service to expunge Williams' record of negative performance references following his protected activity and provide appropriate injunctive relief to address his denial of promotion. The Court finds the requested equitable relief appropriate and warranted under the circumstances. First, Williams' personnel record contains extensive evidence of the Postal Service's retaliation against him. As such, this Court finds that Williams' personnel record should be purged of unwarranted criticisms of his performance after February 2008, including his April 11, 2008 mid-year review, his November 2008 annual review, and the October 2008 Letter of Warning. *See Donovan v. Commercial Sewing, Inc.*, 562 F. Supp. 548, 556 (D. Conn. 1982). Second, the Court has concluded that Williams was denied promotion to Manager of Safety, an EAS 20 position, because he exercised rights protected by the Act. Accordingly, the Court finds that Williams

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

is entitled to designation as an EAS 20 employee with a concomitant increase in pay. *See Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1497 (9th Cir. 1994) (refusing to overturn district court's order that a Title VII plaintiff be "instated" to a position for which he was denied promotion because of his race"). The Court further finds that notice of this litigation, including the Court's findings of facts and conclusions of law, should be posted at the Seattle P&DC, the Seattle District Office, and any facility in which Williams currently works or is assigned following his EAS 20-level instatement.

### D. Further Injunctive Relief

The Secretary has additionally requested broad injunctive relief, nationwide in scope, to vindicate the public interest in promoting safe workplaces and protecting those who dare to advocate for them. The Secretary's proposed injunction includes, among various components, prohibitions against taking adverse action against any Postal Service employee on account of her or his protected activity, against establishing working conditions designed to retaliate or harass a complaining employee, and against failing to train any Postal Service employee of her or his rights under the Act. The Postal Service staunchly opposes the requested injunction on the ground that it would impermissibly expand this action beyond the pleadings to a "pattern and practice" case of retaliation. The Postal Service further contends that the injunction is both vague and overbroad, instructing Defendant to merely follow the law and transmuting any violation of the Act nationwide into a contempt action.

Again, the Court finds it appropriate to analogize to the Title VII context in crafting an injunctive remedy under the substantially similar provisions of the Occupational Safety and Health Act. In the Title VII context, the Ninth Circuit has explained that the EEOC, in prosecuting a Title VII violation, "is not merely a proxy for the victims of discrimination, but acts also to vindicate the public interest in preventing employment discrimination." *EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1542 (9th Cir. 1987) (internal citations omitted). So too, Section 11(c) is designed primarily to serve a public purpose, a purpose which Congress has given the Secretary of Labor the sole authority

to vindicate. *See Marshall v. Occupation Safety & Health Review Comm'n*, 635 F.2d 544, 550 (6th Cir. 1980) (noting that "Congress has vested the exclusive prosecutorial responsibility [for enforcing the Act] in the Secretary of Labor"); *Donovan v. Square D Co.*, 709 F.2d 35, 338-39 (5th Cir. 1983) (noting that the "public nature of these individual remedies is emphasized by the fact that the government alone possess the right to bring suit under Section 11(c)") (internal citation omitted).

Because the government acts foremost to promote public policy in prosecuting discrimination or retaliation against an aggrieved employee, the Ninth Circuit has recognized that the government may seek broad injunctive relief designed to protect employees as a class. *See Goodyear*, 813 F.2d at 1543 (holding that an employee's individual settlement "does not moot the EEOC's right of action seeking injunctive relief to protect employees as a class and to deter the employer from discrimination"). Thus, even when the government pleads individual actions of discrimination, Title VII "authorizes the EEOC to seek class action-type relief without complying with Fed.R.Civ.P. 23," *id.*, and where it has not pled "a pattern or policy of discrimination." *EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 467-68 (6th Cir. 1999). As the Court finds no reason to depart from this logic in the analogous Section 11(c) context, it rejects the Postal Service's contention that the Secretary's proposed injunction is at variance with the pleadings.

While the district court has broad equitable powers to redress past discrimination and prevent its recurrence, it must be satisfied that the requested injunctive relief is needed. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). "Generally a person subjected to employment discrimination is entitled to an injunction against future discrimination, unless the employer proves it is unlikely to repeat the practice." *Goodyear*, 813 F.2d at 1544 (internal citation omitted); *see also Cummings v. Connell*, 316 F.3d 886, 897 (9th Cir. 2003) (providing that the district court may not issue an injunction unless persuaded that there is "some cognizable danger of recurrent violation, something more than a mere possibility"). Factors that the district court examines in determining the likelihood of future violations include:

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the extent to which the defendant's professional and personal characteristics might enable or tempt him to commit future violations; and the sincerity of any assurances against future violations

*U.S. v. Laerdal Mfg. Corp.*, 73 F.3d 852, 852 (9th Cir. 1995). An employer's curative actions following suit are in themselves insufficient to provide "assurances that it will not repeat the violation to justify denying an injunction." *Goodyear*, 813 F.2d at 1544.

The evidence adduced at trial supports the conclusion that injunctive relief is necessary to eliminate past discriminatory effects as well as bar future discrimination similar to that suffered by Williams. It is clear that the retaliatory actions taken against Williams were willful and recurring, perpetuated by his supervisors with support and direction from managers at the very highest levels of authority over his facilities. These supervisors were undoubtedly aware of the wrongfulness of their conduct, instructing recipients of harassing emails to delete them and amassing post hoc, performance-related justifications for the punishment that they inflicted on Williams over a course of years. Further, the evidence clearly shows that hostility toward protected activities, and toward those who seek to fulfill the Act's mandate to prioritize workplace safety, extended beyond Williams' individual context.

Indeed, Charles Kosmicki, Naseem Banani, Sue Felton, and other Postal Service employees and managers testified to a culture of hostility toward OSHA and its goals at both the Seattle P&DC and Queen Anne District Office. Banani and Kosmicki experienced a cascade of treatment similar to that endured by Williams in response to their own protected activities and administered by the same individuals. Evidence adduced shows that employee complaints to OSHA are regarded by Postal Service senior management as liabilities, as acts of disloyalty, and as something to prevent. Unsurprisingly given these experiences, the evidence showed that Seattle P&DC employees are reluctant to make reports of safety hazards to supervisors for fear of discipline. Even anonymous reports are treated with disdain. *See, e.g.* Ex. 24 (complaining about Williams "accepting numerous [safety complaints] from an anonymous source"). Crumrine and Kosmicki further provided credible

testimony regarding Postal Service senior management's pejorative view toward OSHA. These attitudes manifested in the experiences of OSHA investigator Phelps, who testified to the rude and hostile treatment she received in conducting her investigation. Cook's statement to Banani that "no one can touch us," immediately following her threat to terminate Banani unless she retracted her OSHA complaint, illuminates the reprehensible culture of impunity pervasive at the facilities where Williams worked.

Confronted with a record replete with indicia of the willfulness and pervasiveness of retaliatory conduct, the Postal Service has failed to adduce any evidence as to assurances against future violations. The Court fails to identify any evidence of remedial measures taken to prevent similar violations from recurring at the Seattle P&DC or District Office. To the contrary, the Secretary's evidence shows ongoing hostility toward employee health and safety complaints, and two of the main managers responsible for the discriminatory treatment of Williams – Jacobus and Cook – continue as senior management for the Postal Service, with significant supervisory responsibility over numerous employees. In particular, Jacobus is employed as District Manager in Seattle, a "co-executive" position with Senior Plant Manager. Further, there has been no admission or indication from any Postal Service managers, other than Kosmicki, that there was any wrongdoing whatsoever with regard to the Postal Service's treatment of Williams.

The Court does, however, agree with the Postal Service that the requested injunction is overbroad in its geographic scope. While extensive evidence supports the likelihood of continuing violations at the Seattle P&DC and District Office, the locations where Williams and other trial witnesses endured retaliatory treatment, the Secretary has not adduced evidence of OSHA violations extending beyond this immediate geography. Mere speculation that violations similar to those experienced by Williams are likely to recur nationwide is insufficient to support an injunction of the requested breadth. *See W.T. Grant Co.*, 345 U.S. at 633 (cautioning that the party moving for injunctive relief must show that "there exists some cognizable danger of recurrent violation"). The

Court declines to issue injunctive relief divorced from the harms proven at trial. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009). Consequently, the Court shall award the requested relief limited in scope to the facilities about which testimony was presented at trial.

Tailored to the geography at issue, the Court finds that the Secretary has established the propriety of the requested relief. Contrary to the Postal Service's contentions, the Ninth Circuit allows for injunctions that track statutory mandates. *See, e.g. United States v. Miller*, 588 F.2d 1256, 1261 (9th Cir. 1978); *Freitag v. Ayers*, 468 F.3d 528, 537 (9th Cir. 2006). The *Goodyear* court recognized the value of injunctions requiring employers to obey federal anti-discrimination and retaliation laws:

> The district court found that an injunction against retaliation was superfluous because Title VII already prohibits that conduct. We disagree. An injunction would (1) instruct Goodyear that it must comply with federal law, (2) subject it to the contempt power of the federal courts if it commits future violations, and (3) reduce the chilling effect of its alleged retaliation on its employees' exercise of their Title VII rights.

*Goodyear*, 813 F.2d at 1544. The Court finds that the Secretary's requested injunctive relief is sufficiently clear and specific, identifying the method of Section 11(c) violation to be prohibited and preventing the Postal Service from breaching its obligations to prevent such violations in the future. The specter of the Court's exercise of its contempt power in the event of ongoing violations at the specified facilities gives teeth to these requirements. The requirement of posting notice and training employees as to their OSHA rights combats the chilling effect that Defendants' acts of retaliation have had on employees' willingness to report workplace safety and health complaints. Accordingly, the Court grants the Secretary's request of injunctive relief as follows as set forth below.

## V.  CONCLUSION

Having fully considered the evidence presented at trial, the exhibits admitted into evidence, and the argument of counsel, and being fully advised, the Court finds in favor of the Secretary on all claims. The Court shall enter judgment in favor Plaintiff in the amount of $229,228.60 as

compensatory damages for U.S. Postal Service employee Arthur Williams. The Postal Service is directed to instate Williams at an EAS 20 management level with a concomitant increase in pay, to expunge negative performance references in his personnel record from February 2008, and to post notice of this litigation at the Seattle P&DC, District Office, and Williams' Postal Service workplace, as set forth above. The Court further issues injunctive relief as follows.

The United States Postal Service, its agents, attorneys, employees, and all those in active concert or participation with it are permanently enjoined from violation Section 11(c) of the Occupational Safety and Health Act at the Seattle Processing and Distribution Center and District Office in any of the following manners:

A. Discharging, demoting, disciplining, threatening to discipline, or taking any adverse personnel action against any of its employees because the employee has filed any complaint, supported another employee's complaint, reported a safety concern or instituted or caused to be instituted any proceeding under or related to the Occupational Safety and Health Act or because the Postal Service believes that such employee has filed a complaint, supported another employee's complaint or instituted a proceeding or for testifying against the Postal Service regarding a safety complaint;

B. Retaliating against an employee in any way, including verbal or written discipline, negative performance evaluations, subjection to investigative interviews, negative references for promotion or failure to consider for promotion, because the employee has filed any complaint, supported another employee's complaint, reported a safety concern or instituted or caused to be instituted any proceeding under or related to the Act or because the Postal Service believes that such employee has filed a complaint, supported another employee's complaint or instituted a proceeding or for testifying against the Postal Service regarding a safety complaint;

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

C.  Establishing working conditions designed to coerce, intimidate, harass, or dissuade employees from filing any complaint, supporting another employee's complaint, reporting a safety concern or instituting or causing to be instituted any proceeding under or related to the Act;

D. Subjecting any employee to an investigative interview or other investigation or isolation on the subject of his or her contact with the Occupational Safety and Health Administration or support for a coworker's contact with OSHA;

E. Permitting, encouraging or failing to take action against management personnel creating a hostile work environment or disparaging any employee because the employee has filed any complaint, supported another employee's complaint, reported a safety concern or instituted or caused to be instituted any proceeding under or related to the Act or because the Postal Service believes that such employee has filed a complaint, supported another employee's complaint or instituted a proceeding or for testifying against the Postal Service regarding a safety complaint;

F. Failing to train all employees, including temporary and casual employees, of their rights under the Act;

G. Failing to train all management employees, in a manner approved by OSHA, as to the rights of postal service employees to report safety violations, and the prohibitions on management of taking any adverse action or threatening to take adverse action against an employee for exercising his/her rights under Section 11(c) of the Act.

H. Failing to post notices of this litigation, including the Court's findings of fact and conclusions of law, at the Seattle Processing and Distribution Center and District Office.

The Clerk is directed to enter judgment in favor of Plaintiff consistent with these Findings of Fact and Conclusions of Law.

//

//

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER
- 44

It is so ORDERED this 12th day of February 2015.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER
- 45